TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT R. AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
CHRISTOPHER STINER (SBN 276033)
cstiner@ahdootwolfson.com
DEBORAH DE VILLA (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SCRIBER, STACY POWELL, DOUG HARRIGAN, and SUSAN WISNER PHILLIPS, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-01716-MMA-MDD |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Michael Scriber, Stacy Powell, Doug Harrigan, and Susan Wisner Phillips (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant Ford Motor Company ("Defendant" or "Ford").

## NATURE OF THE ACTION

1.      Plaintiffs bring this action on behalf of themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased any of the following Ford and Lincoln branded vehicles which were manufactured with a 3G modem, an obsolete piece of telematics equipment for the indicated model years: Fusion Energi model years 2014-2020, C-MAX Energi model years 2014-2017, Focus Battery Electric Vehicle (BEV) model years 2016-2018, MKZ / MKZ Hybrid model years 2016-2017, MKC model years 2015-2017, Continental model year 2017, and MKX model years 2016-2017 (the "Class Vehicles").

2.      This action is brought to remedy violations of law in connection with Defendant's manufacture, marketing, advertising, selling, warranting, and servicing of the Class Vehicles. The Class Vehicles' internet enabled features, such as roadside emergency safety features and other features available through the MyFord or MyLincoln Mobile App, were rendered inoperable after AT&T's 3G phase out in 2022 due to Ford's installation of obsolete telematics equipment in the Class Vehicles. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

4.     The Court has personal jurisdiction over Defendant and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District. Plaintiff Michael Scriber resides in this District and purchased his Class Vehicle in this District. Ford has marketed, advertised, sold, and leased Class Vehicles within this District.

**<u>PARTIES</u>**

5.     Defendant **Ford Motor Company** is a Delaware limited liability company with its principal place of business located in Dearborn, Michigan. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers and distributors, the Class Vehicles in the United States to Plaintiffs and the other Class members.

6.     Plaintiff **Michael Scriber** is an adult citizen of Alpine, California. On or about August 30, 2020, Plaintiff Scriber purchased a new 2020 Ford Fusion Energi, a plug-in hybrid, from El Cajon Ford, an authorized Ford dealership in El Cajon, California. Plaintiff Scriber's vehicle is covered by a 3 year/36,000-mile New Vehicle Limited Warranty.

7.     Ford's vehicle manual for the vehicle makes no mention of the fact that Ford installed an inferior 3G modem in the vehicle. At the time of his vehicle purchase, Plaintiff Scriber was not informed by Ford that the modem in his vehicle was a 3G modem. The fact that the telematics system relied on a 3G modem was not disclosed by Ford's authorized dealership, on the vehicle's window sticker, or elsewhere at the time Plaintiff Scriber purchased the vehicle.

8.     In or around June 2022, Plaintiff noticed that his MyFord Mobile App was not working. He was unable to remote start his vehicle, check whether his vehicle was charging, or schedule the charging of his plugged-in vehicle. Shortly thereafter, he called Ford to determine what the issue was. Ford informed him that his vehicle's modem was no longer functional and directed him to take his vehicle to an authorized dealer to address the problem. Ford also informed him that the anti-theft system installed in his vehicle that allowed him to identify his vehicle's location in case of theft would no longer function.

Plaintiff Scriber's insurance carrier provides him a premium discount for a functional vehicle anti-theft system which Plaintiff Scriber will lose if the anti-theft system remains non-functional.

9.      On July 11, 2022, Plaintiff Scriber brought his vehicle to the Service Center at El Cajon Ford. At the time, his car had 12,009 miles on it. After this initial visit, Plaintiff Scriber left his vehicle with El Cajon Ford to determine what, if anything, could be done to address the problem with his vehicle's modem. El Cajon Ford's Service Center examined the modem and investigated the issue further. After many weeks and several dozen phone calls, El Cajon Ford's Service Center determined that Plaintiff Scriber's vehicle had a 3G rather than a 4G modem installed. They further informed him that Ford offered a 4G modem upgrade kit, however Ford did not consider it a repair covered by the warranty. They estimated that the upgrade kit costs $458.69, and labor involved would cost $558.48.

10.      On October 14, 2022, Plaintiff sent a letter to Ford demanding that they honor the replacement of his non-functional 3G modem with a functional 4G modem as an authorized repair under the New Vehicle Warranty. Ford did not offer to repair or replace his modem, or otherwise resolve the problems with Plaintiff Scriber's vehicle.

11.      Plaintiff **Stacy Powell** is an adult citizen of Fontana, California. On or about December 24, 2019, Plaintiff Powell leased a new 2019 Ford Fusion Energi, a plug-in hybrid, from Sunrise Ford Fontana, an authorized Ford dealership in Fontana, California. On or about October 23, 2020, Plaintiff Powell purchased her vehicle outright. Plaintiff Powell's vehicle is covered by a 3 year/36,000-mile New Vehicle Limited Warranty.

12.      Ford's vehicle manual for the vehicle makes no mention of the fact that Ford installed an inferior 3G modem in the vehicle. At the time of her vehicle purchase, Plaintiff Powell was not informed by Ford that the modem in her vehicle was a 3G modem. The fact that the telematics system relied on a 3G modem was not disclosed by Ford's authorized dealership, on the vehicle's window sticker, or elsewhere at the time Plaintiff Powell purchased the vehicle.

FIRST AMENDED CLASS ACTION COMPLAINT

13.     In or around June 2022, Plaintiff Powell noticed that her MyFord Mobile App was not working. She was unable to remote start her vehicle, check whether her vehicle was charging, or schedule the charging of her plugged-in vehicle. Shortly thereafter, she called Ford to determine what the issue was. Ford informed her that her vehicle's modem was no longer functional and directed her to take her vehicle to an authorized dealer to address the problem. Plaintiff Powell also understands that the anti-theft system installed in her vehicle that allowed her to identify her vehicle's location in case of theft no longer functions. Plaintiff Powell's insurance carrier provides a premium discount for a functional vehicle anti-theft system which will be unavailable to Plaintiff Powell if the anti-theft system is non-functional.

14.     On June 11, 2022, shortly after her MyFord Mobile App ceased working, Plaintiff Powell called Ford to determine the issue. During that call Plaintiff Powell first learned that the MyFord Mobile App was decommissioned and replaced by the FordPass Mobile App, and that an upgrade to a 4G modem would be necessary. They further informed her that Ford offered a 4G modem upgrade kit, however Ford did not consider it a repair covered by the warranty. They informed her that she would need to purchase the upgrade kit for around $500, but that Ford would cover the labor involved.

15.     Plaintiff Powell again called Ford on August 26, 2022, October 31, 2022, and December 9, 2022, for additional information, however Ford could provide her no further relief. On each call Plaintiff Powell renewed her complaint that Ford installed such an obsolete telematics system in such a recent vehicle model.

16.     Plaintiff **Doug Harrigan** is an adult citizen of Brea, California. On or about October 28, 2020, Plaintiff purchased a new 2020 Ford Fusion Energi, a plug-in hybrid, from Fairway Ford, an authorized Ford dealership in Placentia, California. Plaintiff Harrigan's vehicle is covered by a 3 year/36,000-mile New Vehicle Limited Warranty.

17.     Ford's vehicle manual for the vehicle makes no mention of the fact that Ford installed an inferior 3G modem in the vehicle. At the time of his vehicle purchase, Plaintiff Harrigan was not informed by Ford that the modem in his vehicle was a 3G modem. The

FIRST AMENDED CLASS ACTION COMPLAINT

fact that the telematics system relied on a 3G modem was not disclosed by Ford's authorized dealership, on the vehicle's window sticker, or elsewhere at the time Plaintiff Harrigan purchased the vehicle.

18.     In early 2021, Plaintiff Harrigan learned that the 3G modem installed in his Ford may shortly no longer be operational due to AT&T's shut down of its 3G network. Plaintiff Harrigan contacted Fairway Ford to inquire about the shut down and a service representative informed him that "everything would be ok." They told him that his vehicle would not be affected.

19.     A few months later, Plaintiff Harrigan was at Fairway Ford getting his vehicle serviced and he asked again whether his vehicle would be affected by the pending 3G shutdown. Again, the service department technician told him that his vehicle would not be affected.

20.     In or around February 2022, Plaintiff Harrigan noticed that his MyFord Mobile App was not working. He was unable to remote start his vehicle, check whether his vehicle was charging, or schedule the charging of his plugged-in vehicle.

21.     In or around Spring 2022, after he learned that Ford would require payment to upgrade his vehicle to a 4G modem, Plaintiff Harrigan sent an email to Ford to complain that Ford would not take responsibility for installing inferior technology in his late model vehicle.

22.     Sometime in the second half of 2022, Plaintiff Harrigan telephoned Ford to ask whether Ford would assist him in upgrading his 3G modem. The customer service representative again informed him that upgrading his 3G modem to a 4G modem was not a covered warranty repair, nor would Ford cover any portion of the repair.

23.     Plaintiff *Susan Wisner Phillips* is an adult citizen of San Jose, California. On or about July 29, 2016, Plaintiff Phillips purchased a new 2016 Lincoln MKZ Hybrid Reserve, a hybrid vehicle, from Sunnyvale Ford, an authorized Ford and Lincoln dealership in Sunnyvale, California. Plaintiff Phillips's vehicle is covered by a 3 year/36,000-mile

New Vehicle Limited Warranty and an 8 year/75,000 mile Ford Premium Maintenance Plan.

24.     Ford's vehicle manual for the vehicle makes no mention of the fact that Ford installed an inferior 3G modem in the vehicle. At the time of her vehicle purchase, Plaintiff Phillips was not informed by Ford that the modem in her vehicle was a 3G modem. The fact that the telematics system relied on a 3G modem was not disclosed by Ford's authorized dealership, on the vehicle's window sticker, or elsewhere at the time Plaintiff Phillips purchased the vehicle.

25.     In Spring 2022, Plaintiff Phillips learned on her own due to car issues, without any direct communication from Ford/Lincoln, that neither the MyLincoln App, nor the later introduced LincolnWay App, would communicate with her vehicle and that a new modem would need to be installed if she wanted to restore her vehicle's ability to communicate with the app. Without the repair, she would be unable to remote start her vehicle, check her vehicle's location, contact Lincoln Concierge for roadside assistance, monitor its fuel level, checking basic system functions such as battery life, or use other remote features through the app.

26.     Plaintiff Phillips also understands that the anti-theft system installed in her vehicle that allowed her to identify her vehicle's location in case of theft no longer functions. Plaintiff Phillips's insurance carrier provides a premium discount for a functional vehicle anti-theft system which will be unavailable to Plaintiff Phillips if the anti-theft system remains non-functional.

## FACTUAL BACKGROUND

27.     A Class Vehicle's Mobile App uses the vehicle's onboard wireless module, or modem, to communicate with the secure Ford cloud service through cellular technology. The Mobile App allows you to start, lock, unlock, and locate the vehicle remotely. The Mobile App also connects you with other vehicle resources like a parking locator, roadside assistance, dealer locations, and Ford Support. In recognition of the importance of the theft

and safety features, insurance carriers offer vehicle owners preferential rates for vehicles with those features.

28.   For plug-in hybrids, the Mobile App allows the owner to check the vehicle's battery charge level and total range, and to schedule the time of day the vehicle charges its battery in order to take advantage of when electricity prices are at their lowest.

29.   Ford contracted with AT&T to provide access to its 3G network for the modems installed in the Class Vehicles. As mobile carriers seek to upgrade their networks to use the latest technologies, they periodically shut down older outdated services, such as 3G, to free up spectrum and infrastructure to support new services, such as 5G. Similar transitions have happened before. For example, some mobile carriers shut down their 2G networks when they upgraded their networks to support 4G services. Mobile carriers have the flexibility to choose the types of technologies and services they deploy, including when they decommission older services in favor of newer services to meet consumer demands.

30.   AT&T first introduced 3G in 2006-2007. This was followed by the launch of its 4G LTE service on September 18, 2011. Then, in February 2019, AT&T publicly announced a plan to sunset their 3G wireless network in order to make way for its deployment of its 5G network.

31.   Despite the inevitability of AT&T's decommissioning of its 3G network, and the public announcement of the timetable in February 2019, Ford continued to manufacture the Class Vehicles with a 3G modem. Accordingly, Ford knew or should have known when it manufactured each of the Class Vehicles that AT&T would decommission its 3G network before the end of the usable life of the Class Vehicle and/or while the Class Vehicles were still under warranty.

32.   From 2014 to the present, the only vehicles that Ford manufactured with a 3G modem were the Class Vehicles. All other vehicles were manufactured with 4G modems which remain operational today.

33.   In November 2021, Ford initiated for a limited time Customer Satisfaction Program 21B09 instructing Ford and Lincoln dealers to provide a 4G modem upgrade to

FIRST AMENDED CLASS ACTION COMPLAINT

Class Vehicles. Per the Customer Satisfaction Program, owners within the "complimentary trial period" of their Mobile App could purchase the 4G modem upgrade kit and Ford would cover costs for labor/installation. Owners outside the complimentary trial period of their Mobile App have the option to pay for both the 4G modem upgrade kit and the labor/installation costs. The Customer Satisfaction Program is no longer available to owners of Class Vehicles, regardless of whether they are still within the "complimentary trial period" of their Mobil App. In fact, the Customer Satisfaction Program expired May 31, 2022, meaning Ford would cover no cost associated with the 4G upgrade initiated after that date.

34.     Ford refused to make the 4G upgrade kit installation as a warranty repair or otherwise cover all costs associated with the repair of the 3G modem. As a result of Ford's misconduct, Plaintiffs and the other Class members were each injured on account of receiving Class Vehicles that were fundamentally different from what they believed they were purchasing, less valuable than was represented, and less valuable than what they actually received.

35.     To date, Plaintiffs and Class members have not obtained an adequate repair for the non-functional 3G modem, and they do not know whether Defendant is capable of providing a repair for the non-functional 3G modem beyond its replacement with a 4G modem as described above. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiffs and members of the Class. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction enjoining Defendant and its agents, servants, and employees, and all persons acting under, in concert with, or for it from selling Class Vehicles without notice that they have a non-functional 3G modem which must be replaced with a functional 4G modem.

## TOLLING OF STATUTES OF LIMITATIONS

36.     Defendant had exclusive knowledge of the defective nature of the Class Vehicles' 3G modems, i.e. that they would cease operating when AT&T's 3G network was decommissioned, and knew the defective nature would not be discovered by Plaintiffs and Class Members unless and until the defect manifested. Only Defendant had access to information about the defect, through internal pre-sale testing procedures customarily conducted by Ford, communications with AT&T regarding the eventual decommissioning of its 3G network, and Ford's general knowledge of the telecommunications industry's upgrade to 4G and 5G technology.

37.     Since the defect could not be detected until it manifested itself when the AT&T network was decommissioned, Plaintiffs and Class Members exercising due diligence were not reasonably able to discover the defect until after purchasing the Class Vehicles. Plaintiffs and Class Members could not reasonably have been expected to learn of or discover Defendant's omissions of material information concerning the Class Vehicles until after manifestation of the Defect and only then because they would be forced to research what had happened to their Vehicles. Therefore, the discovery rule applies to all claims asserted by Plaintiffs and Class Members.

38.     Defendant has known about the defect since at least 2019 when AT&T made its announcement of the decommissioning of its 3G network, if not earlier, and has failed to alert Class Members to the defect.

39.     Thus, any applicable statute of limitations has been tolled by Defendant's actions and Defendant is estopped from pleading the statute of limitations because it failed to disclose facts it was obligated to disclose concerning the defect.

## CLASS ALLEGATIONS

40.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a) (b)(2), and (b)(3) on behalf of a Class defined as follows:

**Class**

All persons and entities in the United States that purchased or leased a Class Vehicle for end use and not for resale.

41.     In the alternative, Plaintiffs seek certification of the following class:

**California Class**

All persons and entities in the State of California that purchased or leased a Class Vehicle for end use and not for resale.

42.     Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

43.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

44.     **Numerosity:** The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Ford and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of Class Vehicles have been sold and leased nationwide.

45.     **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

     a.    whether Ford engaged in the conduct alleged herein;

     b.    whether Ford omitted and misrepresented material facts to purchasers and lessees of Class Vehicles;

FIRST AMENDED CLASS ACTION COMPLAINT

c.   whether Ford's omissions and misrepresentations regarding the Class Vehicles were likely to mislead a reasonable consumer;

d.   whether Ford breached warranties with Plaintiffs and the other Class members when it produced, distributed, and sold the Class Vehicles;

e.   whether Plaintiffs' and the other Class members' Class Vehicles were worth less than as represented as a result of the conduct alleged herein;

f.   whether Plaintiffs and the other Class members have been damaged and, if so, the extent of such damages; and

g.   whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

46.   Ford engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

47.   **Typicality:** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct described above. Like Plaintiffs, Class members also purchased or leased a Class Vehicle containing the defect. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and no defense is available to Ford that is unique to Plaintiffs. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class members. Plaintiffs and all Class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Ford's wrongful conduct in selling/leasing and failing to remedy defective Class Vehicles.

48.   **Adequacy:** Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class they represent and have the

FIRST AMENDED CLASS ACTION COMPLAINT

resources to do so. Neither Plaintiffs nor their counsel have interests adverse or antagonistic to those of the Class.

49.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

50.     Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Ford maintains regarding its sales and leases of Class Vehicles.

### CAUSES OF ACTION
### COUNT I
### Breach of Express Warranty
### (On Behalf of Plaintiffs and the Class)

51.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

52.     Plaintiffs and other Class members formed a contract with Defendant at the time they purchased their Class Vehicles. The terms of the contract include the promises and affirmations of fact and express warranties made by Defendant.

53.     Defendant's New Vehicle Limited Warranty provides that "Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle

that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

54.     Plaintiffs' and the other Class members' Class Vehicles did not perform as promised and contained a defective modem which was nonfunctional after the inevitable decommissioning of AT&T's 3G outdated network.

55.     Defendant has actual knowledge that it breached express warranties with Plaintiffs and the other Class members related to the Class Vehicles.

56.     Defendant breached the terms of the express warranties with Plaintiffs and other Class members by not providing the Class Vehicles with properly functioning modems.

57.     Plaintiffs sought repair of their vehicles during the warranty period and Ford refused to make a repair without payment.

58.     As the foreseeable and actual result of Defendant's breach of express warranty, Plaintiffs and the other Class members were damaged in an amount that is the difference between the value of the Class Vehicles if they had possessed a modem capable of functioning without AT&T's outdated 3G network and performed as represented and the value of the vehicles they actually received. Plaintiffs and the other Class members suffered diminution in the value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT II
### Breach of Implied Warranty of Merchantability
### (On Behalf of Plaintiffs and the Class)

59.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

60.     Defendant is and was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted, and sold the Class Vehicles.

61.    A warranty that the Class Vehicles, and their telematics equipment, were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

62.    Plaintiffs and the other Class members purchased the Class Vehicles manufactured and sold by Defendant in consumer transactions.

63.    The Class Vehicles and their modems, when sold and at all times thereafter, were not in merchantable condition and fit for the ordinary purpose for which vehicle telematics equipment are used, evidence by the fact that the inevitable decommissioning of AT&T's outdated 3G network rendered the vehicle modems nonfunctional. The Class Vehicles left Defendant's possession and control with defective modems that rendered them at all times thereafter unmerchantable and unfit for ordinary use. Plaintiffs and the other Class members used their Class Vehicles in the normal and ordinary manner for which Class Vehicles were designed and advertised.

64.    Defendant knew before the time of sale to Plaintiffs and the other Class members, or earlier, that the Class Vehicles were produced with a defective modem that was unfit for ordinary use. This knowledge was based on Defendant's own knowledge of the decommissioning of AT&T's 3G network its modems relied on, its decision to include an alternate 4G modem in other vehicle models produced around the same time, the industry standard practice of making vehicle features that would not be affected by the 3G network shutdown, and Defendant's general knowledge regarding the manufacture of its vehicle modems and integrated systems and software.

65.    Despite Plaintiffs' and the other Class members' normal, ordinary, and intended uses, maintenance, and upkeep, the modem of the Class Vehicles experienced and continue to experience the defect and premature failure after AT&T decommissioned its outdated 3G network.

66.    Plaintiffs' and other Class members' modems and the Class Vehicles are, and at all times were, not of fair or average quality, nor would they pass without objection.

67.    All conditions precedent have occurred or been performed.

68.     Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect upon AT&T decommissioning its outdated 3G network. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect or cure its breaches of warranty.

69.     Plaintiffs and the other Class members suffered and will suffer diminution in the value of their Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

70.     Plaintiffs and the other Class members had sufficient direct dealings with Defendant and its agents (dealers) to establish privity of contract between themselves and Defendant. As alleged *supra,* Plaintiffs purchased their Class Vehicles from Ford dealerships, agents of Ford. Plaintiffs' Class Vehicles were purchased with Ford New Vehicle Limited Warranty. Defendant and Plaintiffs and the other Class members are in privity because of Ford's New Vehicle Limited Warranty, which Defendant extends to Plaintiffs and the other Class members. Privity, nevertheless, is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and the other Class

members. Indeed, under the terms of the New Vehicle Limited Warranty, the warranty applies if the vehicle "was originally sold or leased by Ford Motor Company or one of its dealers in the United States or U.S. Federalized Territories, and it was originally registered/licensed and operated in the United States, U.S. Federalized Territories, or Canada."

**COUNT III**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq*. ("CLRA")**
**(On Behalf of Plaintiffs and the California Class)**

71.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

72.     Defendant is a "person," under Cal. Civ. Code § 1761(c).

73.     Plaintiffs are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a Class Vehicle.

74.     Defendant's conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the Class Vehicles, or omitting material information, violates the CLRA. Specifically, Defendant violated the CLRA by omitting material facts and failing to disclose known defects in its modem, engaging in the following practices proscribed by Civil Code § 1770(a) in transactions that were intended to result in, and did result in, the sale or lease of the Class Vehicles:

- representing that the Class Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

- representing that the Class Vehicles are of a particular standard, quality, or grade if they are of another;

- advertising the Class Vehicles with intent not to sell them as advertised; and

- representing that the Class Vehicles have been supplied in accordance with previous representations when they have not.

75.     Defendant violated the CLRA by selling and leasing Class Vehicles that it knew were equipped with defective modems incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials because the inevitable decommissioning of AT&T's outdated 3G network would render the vehicle modems nonfunctional. Defendant omitted from Plaintiffs and other Class members the material fact that Class Vehicles were sold with this defect in their modems. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

76.     Defendant knew, at the time it sold Plaintiffs their vehicle, of the material fact that the vehicles were equipped with a defective modem in the ways described above, and that the defective modem substantially diminished the quality, performance, safety, and lifespan of Plaintiffs' and other Class members' vehicles. Through internal pre-sale testing procedures customarily conducted by Ford, Ford learned of the defect in the Class Vehicles' modem. Defendant's conduct in selling the defective Class Vehicles and omitting information about the defect was fraudulent, wanton, and malicious.

77.     Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiffs and other Class members suffering actual damage on account of receiving a car that lacked the performance that Defendant represented the vehicles to have and contained defective modems.

78.     Plaintiffs and the other Class members paid for a car that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in Ford's representations, Plaintiffs and the other Class members were damaged on account of receiving a car worth less than as represented. Plaintiffs and the other Class members suffered diminution in the value of Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

79.     Pursuant to § 1782 of the CLRA, Plaintiffs notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. Plaintiff Scriber sent his notice letter on November 3, 2022. Plaintiffs Powell, Harrigan and Phillips sent an additional notice letter on May 5, 2023.

80.     Defendant failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act. Accordingly, Plaintiff Scriber, individually and on behalf of the Class, seeks actual, punitive, and statutory damages, as appropriate. Plaintiffs Powell, Harrigan and Phillips will similarly seek to amend their claims if Defendant similarly takes no action within 30 days in response to their written notice pursuant to § 1782 of the Act.

81.     Pursuant to § 1780(d) of the Act, attached hereto as **Exhibit A** are the affidavits showing that this action has been commenced in the proper forum.

**COUNT IV**
**Violation of California's Unfair Competition Law**
**California Business & Professions Code § 17200,** *et seq*. **("UCL")**
**(On Behalf of Plaintiffs and the California Class)**

82.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

83.     The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising. In the course of conducting business, Defendant committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, refusing to repair or replace the Class Vehicle's nonoperational 3G modem, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code §§ 17200, et seq., 17500, et seq., and the common law.

84.     In the course of conducting business, Defendant committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of Class Vehicles. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiffs and other Class members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

85.     Defendant knew when Class Vehicles were first sold and leased that they were equipped with a defective modem that substantially diminished the quality, performance, and safety and lifespan of the vehicles. Through internal pre-sale testing procedures customarily conducted by Ford, communications with AT&T regarding the eventual decommissioning of its 3G network, and Ford's general knowledge of the telecommunications industry's upgrade to 4G and 5G technology, before the Class Vehicles were introduced to the market, Ford knew of the defect in the Class Vehicles' modem—i.e., that the inevitable decommissioning of AT&T's outdated 3G network would render the vehicle modems nonfunctional.

86.     Plaintiffs allege violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the UCL's "unfair" prong. There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

87.     The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also

constitute advertising within the meaning of § 17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Class Vehicles.

88.    Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

89.    Plaintiffs were deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. Plaintiffs suffered injury in fact and lost money as a result of purchasing deceptively advertised Class Vehicles by paying more than they should have and expending time, effort, and money to attempt to repair or replace their Class Vehicles' modems and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

90.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

91.    Plaintiffs, on behalf of themselves and all others similarly situated, seek restitution from Defendant of all money obtained from Plaintiffs and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendant from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT V
### Fraudulent Omission
### (On Behalf of Plaintiffs and the California Class)

92.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

93.    Defendant knew that the Class Vehicles' modems were defective, would fail, and were not suitable for their intended use, and that the Class Vehicles' defect would lead to the failure of key features like those accessed through the mobile application.

94.    Defendant concealed from and failed to disclose to Plaintiffs and Class members the defective nature of Class Vehicles' modem.

95.     Defendant was under a duty to Plaintiffs and Class members to disclose the defective nature of Class Vehicles' modem because:

- Defendant was in a superior position to know the true state of facts about the defect contained in Class Vehicles' modem;

- Defendant made partial disclosures about the quality of Class Vehicles without revealing the defective nature of the modem; and

- Defendant actively concealed the defective nature of the Class Vehicles' modem from Plaintiffs and other Class members.

96.     The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Had Plaintiffs and Class members known about the defective nature of Class Vehicles' modem, they would not have purchased or leased Class Vehicles, or would have paid less for them.

97.     Defendant concealed or failed to disclose the true nature of the design or manufacturing defects contained in Class Vehicles' modem in order to induce Plaintiffs and Class members to purchase or lease Class Vehicles. Plaintiffs and the other Class members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class members' purchase or lease of the defective Class Vehicles. As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class members have suffered and will continue to suffer actual damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.     Certifying the Class under Federal Rule of Civil Procedure 23 as requested herein;

B.     Appointing Plaintiffs as Class Representatives and undersigned counsel as Class Counsel;

C. Finding that Ford engaged in the unlawful conduct as alleged herein;

D. Awarding Plaintiffs and the other Class members actual, compensatory, and consequential damages;

E. Awarding Plaintiffs and the other Class members statutory damages;

F. Awarding Plaintiffs and the other Class members declaratory and injunctive relief;

G. Awarding Plaintiffs and the other Class members restitution and disgorgement;

H. Awarding Plaintiffs and the other Class members exemplary damages, should the finder of fact determine that Ford acted with malice or oppression;

I. Awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

J. Awarding Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses; and

K. Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated: May 8, 2023                    Respectfully submitted,

*/s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
twolfson@ahdootwolfson.com
ROBERT R. AHDOOT (SBN 172098)
rahdoot@ahdootwolfson.com
CHRISTOPHER STINER (SBN 276033)
cstiner@ahdootwolfson.com
DEBORAH DE VILLA (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**

- 22 -

2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Attorneys for Plaintiffs and the Putative Classes*

FIRST AMENDED CLASS ACTION COMPLAINT