1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

9
10
11

| | |
|---|---|
| MICHAEL SCRIBER, et al., *individually and on behalf all others similarly situated*,<br><br>                                    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>                                    Defendant. | Case No. 22-cv-1716-MMA-AHG<br><br>**ORDER DENYING DEFENDANT FORD MOTOR COMPANY'S MOTION TO COMPEL ARBITRATION**<br><br>[Doc. No. 21] |

12
13
14
15
16
17
18
19
20

21
22
23
24
25
26
27
28

        Plaintiffs Michael Scriber, Stacy Powell, Doug Harrigan, and Susan Wisner Phillips (collectively, "Plaintiffs") bring this putative class action against Ford Motor Company ("Defendant" or "Ford").  *See* Doc. No. 20 ("Second Amended Complaint" or "SAC").  On June 29, 2023, Ford filed a motion to compel arbitration.  *See* Doc. No. 21. Plaintiffs filed an opposition, to which Ford replied.  *See* Doc. Nos. 25, 26.  The Court found the matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1.  *See* Doc. No. 23.  For the reasons set forth below, the Court **DENIES** Ford's motion.

# I. BACKGROUND

Between 2016 and 2020, Plaintiffs purchased or leased new Ford[1] vehicles (the "Vehicles"): in August 2020, Scriber purchased a new 2020 Ford Fusion Energi, *see* SAC ¶ 6; in December 2019, Powell leased a new 2019 Ford Fusion Energi, which she later purchased in October 2020, *see id.* ¶ 11; in October 2020, Harrigan purchased a new 2020 Ford Fusion Energi, *see id.* ¶ 16; and in July 2016, Phillips leased a new 2016 Lincoln MKZ Hybrid Reserve, *see* Doc. No. 21-9; Doc. No. 25 at 9. The Vehicles were covered by a 3 year/36,000-mile New Vehicle Limited Warranty. *See* SAC ¶¶ 6, 11, 16, 23. All of the Vehicles were equipped with a 3G modem, and Plaintiffs allege they were not informed of this fact at the time of their purchase or lease. *See id.* ¶¶ 7, 12, 17, 24.

The 3G modem is an onboard wireless module that allows vehicle owners to communicate with their vehicles using AT&T's 3G network. *See id.* ¶¶ 27, 29. It equipped the Vehicles with internet-capable features, such as roadside emergency safety, *see id.* ¶ 2, and allowed Plaintiffs to remote start the Vehicles, check whether the Vehicles were charging, schedule charging, *id.* ¶¶ 8, 13, 20, 25, check the Vehicles' location, monitor fuel level, and check basic system functions such as battery life, *see id.* ¶ 25. These features were available through the MyFord Mobile App and MyLincoln App. *See id.* ¶¶ 8, 13, 20, 25, 29.

Generally speaking, Plaintiffs allege that Ford's 3G modem was rendered inoperable after AT&T's 3G phase out in 2022. *See id.* ¶ 2. Plaintiffs allege that Ford knew AT&T's phase out of the 3G network was inevitable as early as 2019 and yet continued to manufacture the Vehicles with a 3G modem.[2] *See id.* ¶ 31.

---

[1] The parties agree that Ford manufactures Lincoln branded vehicles as well. *See* SAC ¶¶ 1–2, 5; *see also* Doc. No. 21-1 at 6 fn. 1.

[2] In November 2021, Ford offered a limited time Customer Satisfaction Program, allowing owners to have the upgrade performed at no cost. *See id.* ¶ 33. The program expired in May 2022. *See id.* It appears that none of the Plaintiffs participated in the program.

According to Plaintiffs, they were either informed the modem would stop working, *see id.* ¶ 18, or learned on their own when their mobile app stopped working, *see id.* ¶¶ 8, 13, 20, or when their car developed issues, *see id.* ¶ 25. What ensued next varies. In July 2022, Scriber brought his Vehicle to the Service Center at El Cajon Ford. *See id.* ¶ 9. He was informed that the upgrade to a 4G modem was not considered a repair and thus would not be covered by his warranty. *See id.* It was estimated that the upgrade kit would cost $458.69 and labor costs would total $558.48. *See id.* Also in July 2022, Powell called Ford and was informed that a 4G modem upgrade would be necessary. *See id.* ¶ 14. Ford informed her that she would need to purchase the upgrade kit for $500 but that Ford would cover the labor costs. *See id.* In early 2021, Harrigan contacted Fairway Ford about the phase out, during which time he was informed that his Vehicle would not be affected. *See id.* ¶ 18. During an unrelated servicing a few months later, he was again informed his Vehicle would not be affected. *See id.* ¶ 19. After his mobile app stopped working, Harrigan emailed and called Ford and in the second half of 2022 and was told that Ford would not cover any portion of the upgrade. *See id.* ¶¶ 21, 22. Phillips does not plead what actions she took after learning that an upgrade was necessary.

Plaintiffs allege that to date they have not obtained an adequate repair or replacement for the non-functional 3G modem. *See id.* ¶ 35. As a result, they bring the following five causes of action on behalf of a class of consumers who purchased the Vehicles: (1) breach of express warranty; (2) breach of the implied warranty of merchantability; (3) violation of California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"); (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL"); and (5) fraudulent omission.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a

showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *Id.* The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *AT & T Mobility v. Concepcion*, 563 U.S. 333, 339 (2011). Federal courts are required to rigorously enforce an agreement to arbitrate. *See id.* Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476–77 (1989).

In determining whether to compel a party to arbitrate, the Court may not review the merits of the dispute; rather, the Court's role under the FAA is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (internal quotation marks and citation omitted). If the Court finds that the answers to those questions are "yes," the Court must compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). If there is a genuine dispute of material fact as to any of these queries, a district court should apply a "standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]." *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004).

Agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Courts must apply ordinary state law principles in determining whether to invalidate an agreement to arbitrate. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002). As such, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. *Concepcion*, 563 U.S. at 339–41.

### III. REQUEST FOR JUDICIAL NOTICE

As an initial matter, Ford has filed a request for judicial notice in connection with its motion. *See* Doc. No. 21-10. Plaintiff has not responded to or otherwise opposed Ford's request. Pursuant to Federal Rule of Evidence 201, the Court may take judicial

notice of an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b).  A fact is not subject to reasonable dispute if it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  *Id.*; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Additionally, "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Khoja*, 899 F.3d at 1002.

Ford asks the Court to judicially notice three exhibits: (1) excerpted pages from Ford Credit Auto Lease Two LLC, CAB East LLC, and CAB West LLC's Form SF-3 Registration Statement filed with the U.S. Securities and Exchange Commission on June 8, 2022, *see* Doc. No. 21-11 ("RFJN Ex. A"); (2) a copy of the Retail Installment Sale Contract entered into between Plaintiff Harrigan and Fairway Ford on October 15, 2020, *see* Doc. No. 21-12 ("RFJN Ex. B"); and (3) a copy of the Retail Installment Sale Contract entered into between Plaintiff Scriber and El Cajon Ford on August 30, 2020, *see* Doc. No. 21-13 ("RFJN Ex. C").

The Court finds that Exhibit A is a public record, available on a government website, that is neither in dispute nor can reasonably be questioned.  *See Koja*, 899 F.3d at 999.  Additionally, the Court finds that Plaintiff incorporates Exhibits B and C by reference in the Second Amended Complaint.  *See, e.g.*, SAC ¶¶ 6, 16.  Accordingly, the Court **GRANTS** Ford's request and takes judicial notice of Exhibits A, B, and C.

## IV. DISCUSSION

Ford moves to compel arbitration based upon the following agreements: (1) Scriber and Harrigan's sale contracts; (2) Powell and Phillips' lease agreements; and (3) Scriber, Harrigan, and Phillips' "Connected Services" agreements.  Plaintiffs argue that Ford cannot enforce these agreements, or that they do not provide for mandatory arbitration. The Court addresses each in turn.

**A.     Sale Contracts**

Plaintiffs Scriber and Harrigan entered into retail installment sale contracts with their respective dealerships (the "Sale Contracts").  On August 30, 2020, Scriber entered into a Retail Installment Sale Contract with El Cajon Ford.  RFJN Ex. C.  On October 15, 2020, Harrigan entered into a Retail Installment Sale Contract with Fairway Ford.  RFJN Ex. B.  Both Sale Contracts are substantively identical, as are their arbitration provisions.  The arbitration provisions read, in relevant part:

**ARBITRATION PROVISION**
**PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS**
**1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
**2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**
**3. DISCOVER AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who did not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by court action.

RJFN Ex. B; *see also* RFJN Ex. C.

The Sale Contracts' arbitration provisions also provide that they are governed by the FAA.  *Id.*

It is undisputed that Ford is not a signatory to these Sale Contracts and thus not a signatory to these arbitration provisions: "You" refers to Scriber and Harrigan as the Buyers and "We" or "Us" refers to the Seller-Creditors, El Cajon Ford and Fairway Ford.[3]  Nonetheless, Ford urges that it may enforce these provisions.

"The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)).  The parties agree that California law applies.  *See* Doc. Nos. 21-1 at 17, 25 at 15; *see also* RFJN Ex. B (providing that Federal law and California law apply to the contract); RFJN Ex. C (same).  Ford argues that under California law, it may enforce these agreements based upon Plaintiffs' agency allegations and the doctrine of equitable estoppel.

### 1.   *Agency Relationship*

California permits a nonsignatory to compel a signatory to arbitration under a theory of agency.  To succeed on this theory, Ford must demonstrate that "there is a connection between the claims alleged against the nonsignatory and its agency relationship with a signatory."  *Cohen v. TNP 2008 Participating Notes Program, LLC*, 31 Cal. App. 5th 840, 863–64 (Cal. Ct. App. 2019).

The Court agrees that Plaintiffs unambiguously plead an agency relationship between Defendant and the signatory-Dealers.  For example, in support of their breach of the implied warranty of merchantability claim, Plaintiffs allege that they "had sufficient dealings with Defendant and its agents (dealers) to establish privity of contract between themselves and Defendant. As alleged *supra*, Plaintiffs purchased their Class Vehicles from Ford dealerships, agents of Ford."  SAC ¶ 70.  Seemingly recognizing this,

---

[3] The Court hereinafter refers to the dealerships—El Cajon Ford, Fairway Ford, Sunnyvale Ford, and Sunrise Ford—as the "Dealers."

Plaintiffs do not argue that no agency relationship exists.  Rather, Plaintiffs rely on *Glassburg v. Ford Motor Co.*, No. 2:21-cv-01333-ODW (MAAx), 2021 U.S. Dist. LEXIS 211786, at *11 (C.D. Cal. Nov. 2, 2021), asserting that their claims have no connection to the agency relationship.  *See* Doc. No. 25 at 16–17.

The Court begins with the Second District Court of Appeal decision in *In re Ford Motor Warranty Cases*, 89 Cal. App. 5th 1324 (Cal. Ct. App. 2023) ("*In re FMWC*").  In *In re FMWC*, purchasers of Ford Focus and Fiesta model vehicles experienced problems with the transmissions in their vehicles.  89 Cal. App. 5th at 1330.  They ultimately sued Ford, but not their dealerships, for claims including violations of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.*, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, breach of the implied warranty of merchantability, and fraudulent inducement.  *Id.*  Applying the FAA, the trial court found that Ford was not entitled to enforce the arbitration provision in the sale contracts as a nonsignatory under California law.  *Id.* at 1331.  The Court of Appeal affirmed.  *Id.* at 1343.

With respect to the agency allegations, the Court of Appeal noted that the references to Ford's agents were "ambiguous," *id.* at 1341 ("[*FMC*] *and its agent's* omissions and/or misrepresentations"; "[*FMC*] *and its agents* intentionally concealed and failed to disclose facts"; and that "[FMC] and *its agents* actively concealed the existence and nature of the Transmission Defect"), notably in light of the fact that "[a] corporation can act only through its agents," *id.* (quoting *Kelly v. General Telephone Co.*, 136 Cal. App. 2d 278, 286 (Cal. Ct. App. 1982)).  Here, as discussed above, the agency allegations are not ambiguous.  But it is not enough that there be an alleged agency relationship between Ford and the Dealers.  As the Court of Appeal explained, there must be a connection between Plaintiffs' claims, the agency relationship between Ford and the Dealers, and the Sale Contracts between the Dealers and Plaintiffs.  *Id.*

Plaintiffs' claims, while pursuant to both statute and common law, stem from the central premise that Ford knowingly sold and leased the Vehicles with a modem that was

inevitable for decommission and therefore would ultimately become inoperable.  With respect to their breach of express warranty claim, Plaintiffs plead that Plaintiffs and Ford formed a contract "at the time they purchased their [ ] Vehicles" that included express warranties, but that the Vehicles did not perform as promised.  FAC ¶¶ 52, 54.  As to their breach of the implied warranty of merchantability claim, Plaintiffs allege that their Vehicles, "when sold and at all times thereafter, were not in merchantable condition." *Id.* ¶ 63.  Plaintiffs also contend that Ford violated the CLRA by omitting the modem defect, "intend[ing] to result in, and result[ing] in, the sale or lease of the [ ] Vehicles." *Id.* ¶ 74.  To that end, Plaintiffs also explicitly allege that Ford "violated the CLRA by selling and leasing [the] Vehicles that it knew were equipped with defective modems." *Id.* ¶ 75.  Turning to their UCL claim, Plaintiffs assert that Ford "knew when [the] Vehicles were first sold and leased that they were equipped with a defective modem," and allege that as a result, they paid more than they should have. *Id.* ¶¶85, 89.  Finally, in support of their fraudulent omission claim, Plaintiffs allege that the information about the defective modem were material to the decision of whether to purchase or lease the Vehicles or deciding what price to pay. *Id.* ¶ 96.

Plaintiffs also, importantly, allege that the Dealers did not disclose the fact that the Vehicles were equipped with the allegedly defective modem at the time of the purchases and leases. *Id.* ¶¶ 7 ("The fact that the telematics system relied on a 3G modem was not disclosed by Ford's authorized dealership, on the vehicle's window, or elsewhere at the time Plaintiff Scriber purchased the vehicle."), 12 (same), 17 (same), 24 (same).

On the other hand, as the *In re FMWC* court recognized, "[g]enerally, retailers are not considered the agents of the manufacturers whose products they sell."  89 Cal. App. 5th at 1324 (first quoting *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013); and then citing *Alvarez v. Felker Mfg. Co.*, 230 Cal. App. 2d 987, 1000 (Cal. Ct. App. 1964)).  This is because under California law, "[a]gency requires that the principal maintain control over the agent's actions." *Murphy*, 724 F.3d at 1232 (citing *DeSuza v. Andersack*, 133 Cal. Rptr. 920, 924 (Cal. Ct. App. 1976)).  Here, but for the agency

allegations pertaining to the Dealers' authority to sell Ford vehicles, there are no allegations, evidence, or argument that Ford actually controls the Dealers in such a way that would provide for an agency relationship under California law.  The Court also notes the context within which these agency allegations exist: Plaintiffs expressly plead an agency relationship in support of their breach of the implied warranty of merchantability claim in an effort to demonstrate privity of contract, which they go on to explain is "not required in this case because Plaintiffs . . . are intended third-party beneficiaries of contracts between Defendant and its dealers."  FAC ¶ 70.

Also of note is that the New Vehicle Limited Warranty upon which Plaintiffs' base their breach of warranty claim seemingly provides for optional arbitration that is not final and is nonbinding.  *See* Doc. No. 25 at 10.  Additionally, Plaintiffs do not press a claim for breach of the Sale Contracts.

For these reasons, the Court agrees that *Glassburg* is instructive.  As the *Glassburg* court noted:

> Here, fatal to Glassburg's agency theory is the observation that, if there is any contract between Ford and the Dealer that establishes an agency relationship between those two, that contract certainly is not the Contract under which Glassburg purchased his Mustang. Glassburg s claims against Ford are not for any liability arising from the Contract—that much was made clear in *Kramer*. Similarly, no party contends that Ford was acting in its capacity as the Dealer's agent when Ford breached the warranties, and indeed, such an argument would be absurd, because it would require a party to assert that a manufacturer manufactures products as an agent of the manufacturer's distributor, when, if anything, the opposite is usually true. Thus, the purported agency relationship between Ford and the Dealer is insufficient to support Glassburg's nonsignatory theory.

*Glassburg*, 2021 U.S. Dist. LEXIS 211786, at *11.

In this case, although the Court finds that Plaintiffs unambiguously plead that the Dealers are Ford's agents, they do so in a perfunctory manner and the Court is not sufficiently persuaded that the Dealers were acting as agents on Ford's behalf when they

entered into the Sale Contracts with Plaintiffs Scriber and Harrigan.  Further, it is not clear on this record that any such agency relationship between Ford and the Dealers is sufficiently connected to Plaintiffs' claims, which challenge the decision by Ford to install 3G modems in the Vehicles despite allegedly knowing the technology would soon be rendered obsolete.  Accordingly, the Court finds that Ford has not demonstrated it may enforce the arbitration provisions in the Sale Contracts against Plaintiffs Scriber and Harrigan based upon a theory of agency.

> 2.   *Equitable Estoppel*

California law also permits nonsignatories to invoke arbitration agreements under the doctrine of equitable estoppel, but only in limited circumstances.  *Henson v. United States Dist. of N. Cal.*, 869 F.3d 1052, 1060 (9th Cir. 2017).  Generally speaking, "[e]quitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."  *Kramer*, 705 F.3d at 1128 (quoting *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (internal quotation marks omitted)).

The two circumstances where a nonsignatory may enforce an arbitration agreement under this doctrine are: "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement."  *Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 948–49 (9th Cir. 2022) (quoting *Kramer*, 705 F.3d at 1128–29 (cleaned up) (internal quotation marks omitted)).  "Equitable estoppel thus prevents a plaintiff from having it 'both ways' by seeking to hold a non-signatory liable for obligations 'imposed by [an] agreement,' while at the same time 'repudiating the arbitration clause of that very agreement.'"  *Ngo*, 23 F.4th at 949 (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 220 (Cal. Ct. App. 2009)).

Here, Ford argues that the first circumstance exists.  According to Ford, "Plaintiffs concede that Ford's obligations forming the basis for their claims were part of the contract they entered into with Ford when they purchased their vehicles."  Doc. No. 21-1 at 20.  Ford also points to Plaintiffs' theory of liability—that they paid more for the Vehicles than they were worth—and Plaintiffs' citation to California Civil Code § 1572 in their First Amended Complaint.  *Id.*

"As an initial matter, under California law, warranties from a manufacturer that is not a party to a sales contract are 'not part of [the] contract of sale.'"  *Ngo*, 23 F.4th at 949 (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*, 217 Cal. App. 2d 492, 514 (Cal. Ct. App. 1963)).  "Instead, the express and implied warranties arise 'independently of a contract of sale.'"  *Id.* (quoting *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 60–61 (Cal. 1963)).  Of course, it is relevant that Plaintiffs purchased the Vehicles and therefore the fact that Plaintiffs Scriber and Harrigan entered into the Sale Contracts is a plain and undisputed fact underlying this case.  However, what matters here is that Scriber and Harrigan own, or owned, these Ford-manufactured Vehicles, not that Plaintiffs entered into *these* Sale Contracts.  *See Ngo*, 23 F.4th at 949 ("To be sure, Ngo must show that she owned a BMW, but ownership does not entail an intention to enforce any obligations of the purchase agreement on BMW. BMW was not a party to the agreement and its obligations to Ngo arose independently of her agreement with the dealership.").

Again, the Court finds *Glassburg* instructive.  As that court explained: "Under binding authority of *Kramer*, in the typical case, a consumer's statutory and contractual claims against a vehicle manufacturer based on the condition of the vehicle are not dependent on a purchase contract the consumer may have signed when the consumer purchased the vehicle from a dealer."  2021 U.S. Dist. LEXIS 211786, at *7 (citing *Kramer*, 705 F.3d at 1132).  Similar to *Glassburg*, here Plaintiffs name only Ford as Defendant, not the Dealers, and the Court is not persuaded that their claims are founded in the Sale Contracts.

On this issue, the Court turns back to *In re FMWC*. The Second District Court of Appeal cited to *Greenman* and *Cavanaugh* in concluding that "it does not naturally follow from any contractual character of manufacturer warranty claims that they inhere in a retail sale contract containing no warranty terms." *In re FMWC*, 89 Cal. App. 5th at 1336. Similarly here, the Sale Contracts contain no warranties and Plaintiffs do not allege that Ford breached any warranties that the Dealers covenanted in the Sale Contracts. In fact, as was the case in *In re FMWC*, the Sale Contracts here include no warranty or other promise regarding the quality of the Vehicles and expressly note that the agreements "do[] not affect any warranties covering the vehicle that the vehicle manufacturer may provide." RFJN Exs. B, C. "In short, the substantive terms of the sale contracts relate to sale and financing and nothing more." *In re FMWC*, 89 Cal. App. 5th at 1335.

The Court acknowledges that the California Supreme Court has granted the petition for review in *In re FMWC*, identifying the specific issue as: "Do manufacturers' express or implied warranties that accompany a vehicle at the time of sale constitute obligations arising from the sale contract, permitting manufacturers to enforce an arbitration agreement in the contract pursuant to equitable estoppel?" *Ochoa v. Ford Motor Co. (In re Ford Motor Warranty Cases)*, 532 P.3d 270 (Cal. 2023). Nevertheless, the Court of Appeal's decision in *In re FMWC* is persuasive to the Court at this time, as are the other cases that rely on the same underlying authorities and arrive at the same outcome. Accordingly, the Court finds that the doctrine of equitable estoppel does not permit Ford to compel arbitration.

For these reasons, the Court **DENIES** Ford's motion to compel arbitration based upon the Sale Contracts under a theory of agency or the doctrine of equitable estoppel.

**B.    Lease Agreements**

Next, Ford asserts that Plaintiffs Powell and Phillips must be compelled to arbitrate their claims based upon the arbitration provisions in their lease agreements (the "Lease Agreements"). In July 2016, Phillips entered into a Lease Agreement with Ford Motor

Credit Company and CAB West LLC. *See* Doc. No. 21-9 ("Friedrichs Ex. B"). In December 2019, Powell also entered into a Lease Agreement with Ford Motor Credit Company and CAB West LLC. *See* Doc. No. 21-8 ("Friedrichs Ex. A"). Both Lease Agreements provide that the contract is subject to the FAA and contain the following arbitration provision:

## ARBITRATION

> Arbitration is a method of resolving any claim, dispute, or controversy (collectively, a "Claim") without filing a lawsuit in court. Either you or Lessor/Finance Company/Holder ("us" or "we") (each, a "Party") may choose at any time, including after a lawsuit is filed, to have any Claim related to this contract decided by arbitration. Neither party waives the right to arbitrate by first filing suit in a court of law. Claims include but are not limited to the following: 1) Claims in contract, tort, regulatory or otherwise; 2) Claims regarding the interpretation, scope, or validity of this provision, or arbitrability of any issue except for class certification; 3) Claims between you and us, our employees, agents, successors, assigns, subsidiaries, or affiliates; 4) Claims arising out of or relating to your application for credit, this contract, or any resulting transaction or relationship, including that with the dealer, or any such relationship with third parties who do not sign this contract.

Friedrichs Ex. A; *see also* Friedrichs Ex. B.

It is undisputed that "you" refers to Plaintiffs Powell and Phillips, the Lessors are the Dealers (Sunnyvale Ford in Phillips' instance and Sunrise Ford in Powell's instance), the Finance Company is Ford Motor Credit Company, and the Holder is CAB West LLC. Despite being a nonsignatory, Ford argues it may compel Powell and Phillips to arbitrate their claims based upon equitable estoppel, agency, and third-party beneficiary theories.

### 1. Equitable Estoppel & Agency Allegations

Ford's arguments with respect to the theory of agency and doctrine of equitable estoppel are duplicative of those made in support of its motion to compel arbitration under the Sale Contracts. *See* Doc. No. 21-1 at 22–23. As discussed above, Plaintiffs' claims are premised upon the allegedly improper decision to manufacture and sell the

Vehicles with soon-to-be obsolete technology.  Plaintiffs' claims are not sufficiently connected to the Lease Agreements, which merely relate to the financing of the Vehicles.  Moreover, to the extent Plaintiffs plead that the Dealers were Ford's agents, *see* FAC ¶70, there is no evidence or argument that the Dealers acted on Ford's behalf when entering into these Lease Agreements.  Finally, the express and implied warranties are independent of the Lease Agreements.  Accordingly, for the same reasons discussed above, the Court **DENIES** Ford's motion on this basis.

### 2.   *Third-Party Beneficiary*

Ford also maintains that it may enforce the arbitration provisions in the Lease Agreements as a third-party beneficiary.  *See* Doc. No. 21-1 at 23–26.  Under California law, a nonsignatory may enforce a contract if the "agreement was 'made expressly for [its] benefit.'"  *Ronay Family Limited Partnership v. Tweed*, 157 Cal. Rptr. 3d 680, 685–86 (Cal. Ct. App. 2013) (quoting Cal. Civ. Code § 1559).  In order to succeed under this theory, Ford must prove that "express provisions of the contract," considered in light of the "relevant circumstances," show that (1) "the third party would in fact benefit from the contract;" (2) "a motivating purpose of the contracting parties was to provide a benefit to the third party;" and (3) permitting the third party to enforce the contract "is consistent with the objectives of the contract and the reasonable expectations of the contracting parties."  *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (Cal. 2019).

Beginning with the first element, Ford points to Plaintiffs' Second Amended Complaint, wherein they allege they were harmed by Ford's conduct and that Ford was unjustly enriched.  Doc. No. 21-1 at 24 (quoting SAC ¶ 84).  Additionally, Ford highlights that the "Claims" definition in the Lease Agreements' arbitration provisions includes "Claims between you and us, our employees, agents, successors, assigns, subsidiaries, or affiliates . . . ."  *Id.* (quoting Friedrichs Exs. A & B).  To that end, Ford offers evidence demonstrating that CAB West LLC is a wholly owned subsidiary of Ford Motor Credit Company, RFJN Ex. A, and that Ford Motor Credit Company is a wholly owned subsidiary of Ford, Friedrichs Decl. ¶ 7.

Second, Ford contends that the contracting parties' intent to benefit Ford is apparent from the language of the Lease Agreements, pointing back to the Claims definition as encompassing Ford.  Doc. No. 21-1 at 24.  Third, Ford maintains that allowing it to enforce the arbitration provisions in the Lease Agreements is consistent with the objectives of the contract and reasonable expectations of the contracting parties. *Id.*  In support, Ford also notes that Plaintiffs' pursuit of an action against only nonsignatories is "a quite obvious, if not blatant, attempt to bypass the agreement's arbitration clause."  *Id.* (quoting *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021)).

The Court is not persuaded.  Even assuming the claims subject to arbitration include Plaintiffs' claims against Ford, the Lease Agreements plainly state that only four parties are permitted to invoke the arbitration provision, and Ford is not one of them. Ford relies on *Hajibekyan v. BMW of N. Am., Ltd. Liab. Co.*, 839 F. App'x 187 (9th Cir. 2021).  But *Hajibekyan* is unpublished and therefore not binding.  More importantly, the facts in *Hajibekyan* are distinguishable.  Unlike the arbitration provision in *Hajibekyan*, the arbitration provisions in the Lease Agreements do not extend the right to compel arbitration to the signatories' affiliates.  Instead, the Court finds that the case of *Ngo* is both binding and on point.  *See Ngo*, 23 F.4th at 946.  Similar to *Ngo*, the only parties permitted to compel arbitration here are Plaintiffs Powell and Phillips (as Lessees), the Dealers (as Lessors), Ford Motor Credit Company (as Finance Company), and CAB West LLC (as Holder).  *See id.*  As the Ninth Circuit in *Ngo* aptly explained:

> That BMW could, at some point down the line, receive some benefit if the arbitration clause were read to extend to the manufacturer is of no moment: incidental or secondary benefit is not sufficient. The clause is pellucid that only three parties may compel arbitration, none of which is BMW. Language limiting the right to compel arbitration to a specific buyer and a specific dealership (and its assignees) means that extraneous third parties may not compel arbitration. Any benefit that BMW might receive from the clause is peripheral and indirect because it is predicated on the decisions of others to

arbitrate. BMW therefore fails to meet the first prong of the *Goonewardene* test.

*Id.* at 947 (internal citations omitted).  As such, Ford has not demonstrated that it would benefit from the Lease Agreements.  For this reason, Ford is not permitted to compel Plaintiffs Powell and Phillips to arbitration.  The Court also notes that based upon *Ngo*, Ford has failed to satisfy all of the remaining elements as well.  *See id.* at 948 (discussing the second element: "Though the language allows for arbitration of certain claims concerning third parties, it still gives only Ngo, the dealership, and the assignee the power to compel arbitration. Nothing in the clause or, for that matter, in the purchase agreement reflects any intention to benefit BMW by allowing it to take advantage of the arbitration provision").  The Court appreciates the affiliation between CAB West LLC, Ford Motor Credit Company, and Ford.  But Ford's "relative proximity to the contract confirms that the parties easily could have indicated that the contract was intended to benefit [Ford]—but did not do so." *Id.*

Accordingly, the Court **DENIES** Ford's motion to compel Plaintiffs Powell and Phillips to arbitrate their claims on this basis.

## C.    Connected Services Agreements

Finally, Ford contends that Plaintiffs Scriber, Harrigan, and Phillips must be compelled to arbitrate their claims based upon the terms of their mobile app agreements (the "Connected Services Agreements").  As alleged in the Second Amended Complaint, the 3G modem technology allows a vehicle owner to communicate with his vehicle using the Ford and Lincoln mobile apps.  *See* SAC ¶¶ 8, 13, 20, 25, 29.  According to Ford, FordPass and Lincoln Way are mobile apps administered by Ford, and vehicle owners must create and maintain accounts in order to access and utilize the technology.  Doc. No. 21-2 ("Vedula Decl.") ¶ 3.  Ford maintains that Scriber, Harrigan, and Phillips maintain such accounts, *id.* ¶ 5, and that account holders are required to agree to the Connected Services Agreements' terms and conditions to access and manage the accounts, *id.* ¶ 3.

According to Ford's records, Plaintiff Scriber has maintained a FordPass account since August 31, 2020.  *Id.* ¶ 5(a).  Scriber agreed to the Connected Services Agreement's April 4, 2022 revised terms on June 30, 2022.  *Id.*; *see also* Vedula Ex. A.  Plaintiff Harrigan has maintained a FordPass account since August 14, 2019.  *Id.* ¶ 5(b).  Harrigan agreed to the Connected Services Agreement's January 25, 2023 revised terms on March 25, 2023.  *Id.*; *see also* Vedula Ex. B.  Plaintiff Phillips has maintained a Lincoln Way account since October 31, 2017.  *Id.* ¶ 5(c).  Phillips agreed to the Connected Services Agreement's January 25, 2023 revised terms on April 13, 2023.  *Id.*; *see also* Vedula Ex. C.  Ford also offers the prompt presented to Plaintiffs Scriber, Harrigan, and Phillips, demonstrating that all three were required to click "I Accept" when presented with the revised terms in the Connected Services Agreements order to continue accessing their accounts.  Vedula Ex. D.

As relevant, the Connected Services Agreements, *see* Vedula Exs. A–C, are identical.  They provide that Michigan law governs the terms of these Agreements, and provide the following with respect to arbitration:

21. Class or Collective Actions

For the purposes of this section: "Us" or "We" shall mean Ford Motor Company, its Asignees, and their employees, directors, officers, agents, predecessors, succcessors, subsidiaries, and affiliates.  "You" shall include yourself, and/or your successors and beneficiaries.  "Party" shall mean either You or Us.

AGREEMENT TO ARBITRATE: Arbitration is a method of resolving any claim, dispute, or controversy (collectively, a "Claim") in front of one or more neutral individuals instead of filing a lawsuit in court and having a trial in front of a judge or jury.

Each Party may bring Claims against the other only on an individual basis and not as a plaintiff or class member in a class, collective, representative, public injunctive relief, or private attorney general actions.  The arbitrator may not preside over any consolidates, representative, class, collective or private

attorney general action involving You and Ford. The arbitrator may award relief only to the extent necessary to provide relief necessitated by the Claims. The arbitrator cannot, without consent of all parties: 1) combine one claim with another, 2) facilitate notification to others of potential claims, or 3) arbitrate any type of representative or multi-plaintiff proceeding.

If the bar to Claims or remedies for public injunctive relief or private attorney general action is held unenforceable, You and Ford agree any such Claims or remedies shall be severed and stayed before a Court with applicable jurisdiction pending final resolution of the arbitration on any remaining Claims or remedies subject to arbitration.

Vedula Ex. A; *see also* Vedula Exs. B & C.

To begin, neither party briefs the choice of law issue. Again, the Connected Services Agreements provide that Michigan law governs. Curiously, both parties cite to Michigan and California state court cases in support of their respective positions on this issue. *See* Doc. No. 21-1 at 27; Doc. No. 25 at 31. In any event, California choice of law principles, in accordance with the Second Restatement of Conflict of Laws, "strongly favor enforcement of choice of law provisions, so long as those provisions are freely and voluntarily agreed upon." *Hughes Elecs. Corp. v. Citibank Del.*, 15 Cal. Rptr. 3d 244, 248 (Cal. Ct. App. 2004) (citing *Nedloyd Lines B.V. v. Superior Court*, 11 Cal. Rptr. 2d 330, 333 (Cal. 1992)). Because Ford's principal place of business is in Dearborn, Michigan, which is located in Wayne County, the substantial relationship test is met. *Hughes Elecs.*, 15 Cal. Rptr. 3d at 249. Moreover, neither party argues, nor does the Court find, that Michigan law governing contract formation and interpretation is contrary to California public policy. Accordingly, the Court applies Michigan law to the threshold questions of whether Plaintiffs agreed to resolve their claims through arbitration.

"The elements of a valid contract in Michigan are: '(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.'" *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (quoting *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005) (internal quotation marks omitted)). Michigan

law seems to recognize clickwrap agreements as enforceable so long as the consumer "had reasonable notice, actual or constructive, of the terms of the putative agreement" and "manifest[ed] assent to those terms." *Lee v. Panera Bread Co.*, No. 1:22-cv-11958, 2023 U.S. Dist. LEXIS 49246, at *9 (E.D. Mich. Mar. 6, 2023) (applying Michigan law). Here, Plaintiffs do not dispute that they are bound by the Connected Services Agreements, or that they otherwise did not have notice of the Agreements or their terms. Rather, Plaintiffs argue that that this provision merely provides for optional arbitration and that "[n]othing in [the provision] dictates that arbitration is the only forum in which Plaintiffs can bring their claims." Doc. No. 25 at 31.

Michigan recognizes that "[t]he cardinal rule of contract interpretation is to ascertain the parties' intent." *People v. Swirles*, 553 N.W.2d 357, 358 (Mich. Ct. App. 1996) (citing *Rasheed v Chrysler Corp*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)); *see also Bazzi v. M S Int'l Inc*, No. 2:21-CV-11788-TGB, 2022 U.S. Dist. LEXIS 50520, at *13–14 (E.D. Mich. Mar. 21, 2022) ("A court's primary obligation when interpreting a contract is to determine the intent of the parties.") (citing *Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 373 (Mich. Ct. App. 2019)). "The parties' intent is discerned from the contractual language as a whole according to 'its plain and ordinary meaning.'" *Bazzi*, 2022 U.S. Dist. LEXIS 50520, at *13–14 (citing *Radenbaugh v. Farm Bureau Gen. Ins. Co. of Mich.*, 610 N.W.2d 272, 275 (Mich. Ct. App. 2000)). Under Michigan law, "[a]n arbitration agreement is a contract by which the parties forgo their rights to proceed in civil court in lieu of submitting their dispute to a panel of arbitrators." *Galea v. FCA US LLC*, 917 N.W.2d 694, 698 (Mich. Ct. App. 2018) (internal citation and quotation marks omitted).

Courts apply "a summary judgment-like standard and rule as a matter of law when there are no genuine issues of material fact regarding the existence of an arbitration agreement." *Slade v. Empire Today, LLC*, No. 20-cv-2393 DMS (KSC), 2021 U.S. Dist. LEXIS 127498, at *11 (S.D. Cal. July 7, 2021). Here, the Court finds that there is no genuine issue of material fact as to the existence of the Connected Services Agreements

and the provisions contained therein.  However, Ford has not demonstrated that these Agreements contain an agreement to submit the dispute between the parties here to arbitration as a matter of law.  First, Ford has not properly briefed the issue under the applicable state law: Michigan.  Second, the provisions can only be described as a hodgepodge of statements.  *See* Vedula Exs. A–C.  The section is entitled "Class or Collective Actions."  After defining the parties, the Agreements proceed to define the term "arbitration."  The remainder of this section merely purports to prohibit bringing various types of claims and requests for relief in front of an arbitrator.  Among other things, these provisions do not contain any language suggesting that arbitration is mandatory or otherwise providing that arbitration is in lieu of pursuing claims in court.  The provisions also fail to identify any applicable arbitration procedures or rules.  The Agreements contain no delegation clause, no invocation of the American Arbitration ("AAA") rules, *see Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability"), and no clear and unmistakable indication that the issue of arbitrability of Plaintiffs' claims is arbitrable, *id.* (providing that while a court must determine the gateway issues, such "issues can be expressly delegated to the arbitrator where the parties *clearly and unmistakably* provide otherwise") (internal quotation marks and citation omitted).  To that end, Ford does not argue or otherwise brief the scope of the asserted agreements to arbitrate.

Surely, Ford knows how to draft a mandatory and binding arbitration clause, and this is not it.  The Court is utterly unable to discern the intention of the parties with respect to these provisions in the Connected Services Agreements.  As a result, these provisions must be construed against Ford.  *See Cole v. Auto Owners Ins. Co.*, 723 N.W.2d 922, 924 (Mich. Ct. App. 2006) ("[C]ontracts are construed against the drafter only when there is a true ambiguity and the parties' intent cannot be discerned through all conventional means, including extrinsic evidence.") (citing *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 454–55 (Mich. 2003)).

While the Court must address the gateway issues in resolving a motion to compel arbitration, it is Ford's burden to demonstrate that these questions of law should be resolved in its favor.  The Court finds that Ford has not met its burden of showing that there is a mandatory arbitration agreement that encompasses the dispute here under Michigan law.  Accordingly, the Court **DENIES** its motion to compel arbitration based upon the Connected Services Agreements.

**V. CONCLUSION**

Based upon the foregoing, the Court **DENIES** Ford's motion to compel arbitration.  **IT IS SO ORDERED**.

Dated:  November 7, 2023

HON. MICHAEL M. ANELLO
United States District Judge